REVISED - March 12, 2001

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

m 99-20590

_____


THE PROCTER & GAMBLE COMPANY
AND
THE PROCTER & GAMBLE DISTRIBUTING COMPANY,

Plaintiff-Appellants,

VERSUS

AMWAY CORPORATION, ET AL.,

Defendants,

AMWAY CORPORATION; THE AMWAY DISTRIBUTORS ASSOCIATION COUNCIL;
JA-RI CORPORATION; DONALD R. WILSON; WOW INTERNATIONAL, INC.;
WILSON ENTERPRISES, INC.;
RONALD A. RUMMEL,
INDIVIDUALLY DOING BUSINESS AS RUMMEL ENTERPRISES;
KEVIN SHINN; RANDY HAUGEN; FREEDOM ASSOCIATES, INC.;
FREEDOM TOOLS, INC.; RANDY WALKER; WALKER INTERNATIONAL NETWORK;
GENE SHAW;
JOHN & JANE DOES 6-10,
BUSINESS ENTITIES;
DEXTER YAGER, SR.; BIRDIE YAGER;
AND
D&B YAGER ENTERPRISES, INC.,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas

February 14, 2001

Before SMITH and DENNIS,
    Circuit Judges, and ROETTGER,[*]
    District Judge.

JERRY E. SMITH, Circuit Judge:

The Procter & Gamble Company ("P&G") appeals the dismissal of its lawsuit against Amway Corporation and other defendants for defamation, fraud, and violations of the Lanham Act, RICO, and Texas state law. We affirm in part, reverse in part, and remand.

## I.

P&G, a manufacturer and distributor of numerous household products, has been plagued by rumors of links to Satanism since the late 1970's or early 1980's. The most common variant of the rumor is that the president of P&G revealed on a television talk show that he worships Satan; that many of P&G's profits go to the church of Satan; and that there is no harm in such disclosure, because there are no longer enough Christians left in the United States for such devilish activities to make a difference. The rumor often was circulated in the form of a written flier that listed numerous P&G products and called for a boycott.

P&G has spent considerable time and money unsuccessfully trying to determine the origi-

nal source of the rumor and to squelch it. P&G has not been able to prove how the rumor began, although it asserts here that the rumor was either started or spread by Amway[1] or its distributors in the 1980's. P&G offered no proof that Amway originally started the rumor, but it did offer evidence showing that various Amway distributors spread it in the

___

[*] District Judge of the Southern District of Florida, sitting by designation.

[1] Amway manufactures and distributes household products, many of which compete directly with P&G's products. Amway distributes its products in a fairly distinctive manner, however, using a system of direct marketing in which its distributors are recruited as independent contractors into a hierarchical system of distribution. Amway has more than a million distributors around the world, each of whom is encouraged both to sell Amway products directly to consumers (including the distributor's own household) and to recruit others to be Amway distributors.

The distributors earn money both by a percentage of the income from Amway products they personally sell and by a percentage of the income from sales made by every distributor whom they have directly recruited, and by those distributors further "downline" who have been recruited as recruits of recruits. Amway's success depends on the efforts of its distributors to encourage downline distributors to buy Amway products and continually to recruit new distributors to replace those lost to attrition. Amway encourages "upline" distributors to motivate those below them in the hierarchy and downline distributors to "emulate" those distributors above them.

1980's. Rather than suing Amway at that time, however, P&G worked with Amway's corporate headquarters, which promised to help stop the rumor.

The rumor re-surfaced on April 20, 1995, when an Amway distributor named Randy Haugen forwarded it to other Amway distributors via a telephone messaging system for Amway distributors known as "AmVox."[2]

Haugen is a highly successful Amway distributor with a network of tens of thousands to possibly 100,000 distributors underneath him throughout Utah, Nevada, Texas, Mexico, and Canada. He also served on Amway's Distributors Association Council ("ADAC"), which is an advisory body for Amway distributors. Defendants Freedom Associates, Inc.; Freedom Tools Inc.; Randy Walker; and Walker International Network are Amway distributors in Haugen's distribution network.

There is no evidence that Haugen knew the rumor was false when he spread it; in fact, he testified that he believed it to be true. The

---

[2] AmVox is a communication system that Amway sells to its distributors to facilitate communication between and among them. Haugen received the rumor about P&G from another Amway distributor via AmVox and forwarded it to all his distributors saying, "This is a great message. Listen to it." The message was:

Hey, Jeff, this is Roger Patton. I wanted to run something by you real quick that I think you'll find pretty interesting. I was just talking to a guy the other night about this very subject and it just so happens that a guy brings information in, lays it on my desk this morning, so here it goes. It says the president of Procter & Gamble appeared on the Phil Donahue Show on March 1st of '95. He announced that due to the openness of our society, he was coming out of the closet about his association with the Church of Satan. He stated that a large portion of the profits from the Procter & Gamble products go to support a satanic church. When asked by Donahue if stating this on television would hurt his business, his reply was there are not enough Christians in the United States to make a difference. And below it has a list of the Procter & Gamble products, which I'll read:

Duncan Hines     Bounce
                          Cheer
Bold     Cascade     Joy
Comet     Folgers     Jif
(continued...)

[2](...continued)

| Dawn | Crisco | Always |
|---|---|---|
| Downy | Puritan | Attends |
| | | Undergarments |
| Gain | Secret | Oil of Olay |
| Mr. Clean | Sure | Wondra |
| Oxydol | Head and Shoulders | |
| Camay | Spic-n-Span | Pert |
| Coast | Tide | Prell |
| Ivory | Top Job | Vidal Sassoon |
| Lava | Luvs | Safegard |
| Pampers | Zest | Pepto-Bismol |
| Charmin | Scope | Puffs |
| Crest | Gleem | |

and says if you're not sure about a product, look for the symbol of the ram's horn that will appear on each product beginning in April. The ram's horn will form the 666 which is known as Satan's number. I tell ya, it really makes you count your blessings to have available to all of us a business that will allow us to buy all the products that we want from our own shelf and I guess my real question is, if people aren't being loyal to themselves and buying from their own business, then whose business are they supporting and who are they buying from. Love ya. Talk to you later. Bye.

rumor circulated in his and other distribution networks. Some Amway distributors printed fliers containing the rumor, circulating them to consumers, with a message saying, "We offer you an alternative." The fliers also gave contact information for Amway distributors. Although P&G has received complaints and inquiries about this rumor for the last twenty years, it offered evidence to show that, at the time the rumor was circulating on AmVox, the number of complaints and inquiries increased substantially in the states in which the majority of Haugen's distributors live.[3]

Within days of the initial message containing the rumor, Haugen sent a short retraction via AmVox.[4] Shortly thereafter, an Amway representative contacted Haugen and delivered a copy of a P&G "truth kit," which explains that the rumor is false. The Amway representative asked Haugen to issue another retraction via AmVox. Using the AmVox system, Haugen then sent out a second, more detailed, retraction.[5] Despite Haugen's retractions, the

---

[3] None of the complaints stated that the complainant had heard the rumor via AmVox.

[4] The retraction stated:

Hey gang. We sent a message down a while back to do with Procter & Gamble. It cannot be substantiated, that it happened (*drop out on tape*) so I'm going to assume that it didn't actually happen. Um, please do not call Phil Donahue and please do not call Procter & Gamble and just drop it and don't talk about it anymore. We'd just appreciate that a whole bunch. We do not think that it happened. Thank you. Good-bye.

[5] The second retraction stated:

(continued...)

---

[5](...continued)
Hello guys. This message is going out to all of Valerie and I's frontline and also to every diamond in the organization. Uh, we had an Amvox that came down that talked about Procter & Gamble. A lot of you I understand did not get this Amvox, uh, but if you didn't get it, still pay attention to this because if this rumor ever comes up again you need to stamp it out. Uh, it was rumored that on a television show, on the Phil Donahue show, and it is rumored on other talk shows, that uh, the CEO or officers from Procter & Gamble Company went onto the show and told them that their symbol represents Satanism, the symbol on all their products, and also that they practice Satanism. I'm going to read you a statement here and see if we can get this rumor cleared up because I know a lot of you would like to know the truth and it is very important that you understand this. False rumors: Unfortunately this familiar trademark has been subjected to prosperous, excuse me, preposterous unfounded rumors since 1980-81. The rumors falsely allege that the trademark is a symbol of Satanism or devil worship. Typically the story reports a Procter & Gamble executive discussed Satanism on a national televised talk show. Another story maintains that the trademark is a result of Procter & Gamble being taken over by the Moonies, followers of Reverend Sun Yung Moon and his Unification Church. The rumors are, of course, totally false. Their trademark originated in 1851 as a symbol for their Star brand candle. Later it was designed to show a man in the moon looking over a field of 13 stars commemorating the original American colonies. It represents only Procter & Gamble. So if you hear any rumors saying anything to the effect that they are practicing Satanism and their symbols on their products, uh, are satanic, then

(continued...)

rumor continued to circulate in Haugen's network and at least one other network for some time.

## II.

In response to the spread of the rumor among Amway distributors, P&G filed a lawsuit in each of two federal district courts. In 1995, in Utah, it sued Haugen, Freedom Associates, Inc., and Freedom Tools, Inc., for spreading the Satanism rumor, claiming it lost customers as a result of the actions of Haugen and other Amway distributors. P&G later joined Amway, Randy Walker, and Walker In-

ternational Network as defendants. In 1996, P&G filed a second amended complaint containing causes of action for defamation, common-law unfair competition, violations of the Utah Truth in Advertising Act, tortious interference, negligent supervision, violations of Lanham Act § 43(a), 15 U.S.C. § 1125(a), and vicarious liability. P&G then filed a third amended complaint alleging that Amway is an illegal pyramid and alleging fraud and product disparagement; that complaint was dismissed in 1997. Later in 1997, P&G filed a motion for leave to file a fourth amended complaint to assert fraud and disparagement claims; the Utah court denied the motion as untimely.

One day after its third amended complaint was dismissed in the Utah action, P&G filed the suit at issue in this appeal, in Texas. This suit is based on the same transactions, and involves substantially the same parties, as does the Utah suit. It names Haugen, Amway Corporation, ADAC, and various other Amway Distributors (all hereinafter referred to as "Amway") as defendants.[6] The Texas com

---

[5](...continued)

> it is absolutely 100% false. Uh, we don't want any bad rumors about any competitors or non-competitor, any company anywhere ever going out from us. So if anybody you hear talking about this in the organization anywhere at all brings this up, it is absolutely not true. Not only is not just substantiated, but is not true, period. Amway Corporation does not endorse spreading false and malicious rumors against Procter & Gamble or any other company. Please do your part as independent distributors by not spreading this rumor any farther or nipping it if you hear it from anybody else. We appreciate that a whole lot, uh, so let's crush that, if you're hearing any kind of stuff anywhere let's get rid of it and let's go on and build us a huge business and not have any of this kind of junk and that's a good lesson to be very, very, very, careful about putting anything down on Amvox that's not substantiated, and if anybody could take the blame on this, I can take it. So, uh, we just don't want anything to do with it and it was a mistake. It did go out to a few people . . . (*drop out*).

---

[6] ADAC, Ja-Ri Corporation ("Ja-Ri"), Donald Wilson, WOW International, Inc., Wilson Enterprises, Inc., Ronald Rummel, Kevin Shinn, Gene Shaw, Dexter Yager, Sr., Birdie Yager, and D&B Yager Enterprises (all listed as defendants on P&G's brief) were not defendants in the Utah suit, but, as Amway distributors, they were in privity with the distributors who were defendants there. It is uncertain to what extent P&G is appealing the dismissal of some of these defendants. Although P&G's brief claims error on the part of the district court in the dismissals of ADAC and Ja-Ri, P&G admits in its initial brief that, at the time the court below dismissed the remaining claims, "[t]he remaining defendants were Amway . . . Randy Haugen, Randy Walker, Dexter Yager, and Donald Wilson."

(continued...)

5

plaint sought remedies for the alleged conduct of defendants in (1) spreading the Satanism rumor, (2) disparaging P&G's Crest toothpaste, and (3) allegedly harming sales of P&G's products by inducing people to become Amway distributors and consumers by luring them into an illegal pyramid scheme and misleading them as to the financial rewards of selling Amway. P&G asserted various causes of action in its Texas suit, including common-law fraud; several violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d); and violation of TEXAS BUSINESS AND COMMERCE CODE § 16.29.[7]

The Texas district court granted Amway's FED. R. CIV. P. 12(b)(6) motion dismissing P&G's RICO claim, because P&G did not allege that it had relied on Amway's alleged predicate acts of mail and wire fraud. Then, on summary judgment, the court held that P&G lacked standing to bring its § 43(a) claim based on Amway's alleged illegal pyramid scheme and that the fraud claim was time-barred. In September 1998, the Utah court granted defendants' joint motion for summary judgment and dismissed the § 43(a) claim, stating that "the misrepresentation at issue does not relate to a product within the meaning of the Lanham Act." Inexplicably, in the Utah court, P&G claimed only that Amway's actions constituted a violation of the Lanham Act's prohibition on the misrepresentation of goods or services, even though that act also provides a cause of action for misrepresentation of commercial activity.[8]

P&G did not argue that repetition of the Satanism rumor constituted misrepresentation of its commercial activities until its FED. R. CIV. P. 60(b) motion for reconsideration of the Utah court's grant of summary judgment. The Utah court denied P&G's motion for reconsid-

---

[6](...continued)
P&G does not contest the earlier dismissal of any defendants except ADAC and Ja-Ri. WOW International, Inc., Wilson Enterprises, Inc., Ronald Rummel, Kevin Shinn, Gene Shaw, Birdie Yager, and D&B Yager Enterprises are not even mentioned in P&G's initial brief other than on its cover. Thus, P&G either does not appeal their dismissals from the suit or has waived any argument against their dismissals. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994).

[7] The only claim that remains on appeal from the Texas case that P&G did not assert in the Utah case is for violation of TEXAS BUSINESS & COMMERCE CODE § 16.29. P&G brought a number of other claims in its initial Texas complaint that it had not raised in the Utah suit, but it does not appeal the ruling as to those claims.

[8] Section 43(a) provides:

Any person who, in or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which SS

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

eration, finding no excuse for P&G's failure to raise the commercial activities claim earlier.

In March 1999, the Utah court granted summary judgment to defendants on the defamation *per se*, vicarious liability, and negligent supervision claims. A few days later, before the Texas case went to trial, the Utah court entered a final judgment dismissing all of P&G's claims.

After the final judgment from the Utah court, Amway moved for judgment as a matter of law ("j.m.l.") in the Texas case. The district court denied the motion because it was filed after the deadline for pre-trial motions. At the close of P&G's case, Amway again moved for j.m.l. The court granted the motion and dismissed the § 43(a) claim against Amway, Walker, and Haugen based on the *res judicata* effect of the Utah court's decision. The Texas court dismissed the § 43(a) claim for disparagement of commercial activities against the remaining defendants (and against Amway, Walker, and Haugen for purposes of vicarious liability), because it found that P&G had not presented sufficient evidence of "actual malice," which the court held to be a requirement of § 43(a) suits brought by "limited-purpose public figure" plaintiffs.[9] The court also dismissed the TEXAS BUSINESS AND COMMERCE CODE § 16.29 claim and all remaining claims.

---

[9] The court ruled that P&G was a "limited-purpose public figure" with regard to the Satanism rumor and that thus the First Amendment protection of the *New York Times v. Sullivan*, 376 U.S. 254 (1964), "actual malice" test applied to shield erroneous but non-malicious speech regarding an issue of public concernSSin this case, P&G's alleged links to Satanism.

After oral argument had been heard in this court, the Tenth Circuit reversed the Utah summary judgment. *P&G v. Haugen*, 222 F.3d 1262 (10th Cir. 2000). The Tenth Circuit addressed P&G's misrepresentation of commercial activities claim, even though P&G had not timely raised it before the Utah district court. The Tenth Circuit explained its willingness by stating that where an issue is purely a matter of law, its resolution is certain, and public interest is implicated, it should be addressed on appeal. *Id.* at 1271. The Tenth Circuit concluded that the repetition of the Satanism rumor raised a claim under the "commercial activities" prong of the Lanham Act, and it therefore reversed and remanded as to the Lanham Act claim and reversed the dismissal of P&G's Utah state law tortious interference claim. *Id.* at 1280.

III.

The *res judicata* effect of the Utah judgment is a question of law that we review *de novo*. *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997). This questionSSto which both sides direct most of their briefsSShas largely been answered for us by the Tenth Circuit.

There is no *res judicata* effect from the Utah case. The final judgment has been reversed and remanded, and therefore no judgment blocks the Texas case from proceeding. Of course, at the time the Texas court dismissed, there was a final judgment in Utah, so the Texas court did not err. Now that the final judgment has been reversed and remanded, however, *res judicata* no longer binds us.

Amway argues that *res judicata*, or, alternatively, issue preclusion, settles this case, despite the Utah remand. It contends that the Tenth Circuit's holding that it is not vicari-

7

ously liable under Utah law for the acts of its distributors precludes liability under the Lanham Act in the Texas suit. This is a bold assertion, for the Tenth Circuit did not reach this conclusion, but, instead, "le[ft] it to the district court to consider whether P&G has met those elements of a § 43(a) Lanham Act claim not before us in this appeal." *Haugen*, 222 F.3d at 1276. Likewise declining to let a decision on state law vicarious liability determine the outcome of a Lanham Act claim, we conclude that neither *res judicata* nor collateral estoppel bars the Lanham Act claim and that the Texas case may proceed.[10]

## IV.

P&G avers that the district court erred in ruling that P&G was required to prove "actual malice"[11] to prevail on its § 43(a) claim for disparagement of commercial activities. The actual-malice standard has developed in cases involving defamation of public figures. P&G argues that strict liability and not actual malice

___

[10] Of course, the Texas district court retains its normal discretion in scheduling cases and granting stays pending other developments or the outcomes of similar trials. Should the court try this case to conclusion before the Utah court does, however, then the tables will be turned, and it will be left to the Utah court and the Tenth Circuit to determine the *res judicata* effect on the Utah case of the Texas court's decision.

[11] "Actual malice" is a term of art meaning that the speaker knew the statement was false when spoken or in fact entertained serious doubt about its truth. *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 560 (5th Cir. 1997). Actual malice must be proven by clear and convincing evidence. *Id.*

applies in a commercial speech[12] case under the Lanham Act.

Amway makes two arguments in response. First, acknowledging that the Lanham Act covers only commercial speech, Amway urges that the speech here is not commercial and that therefore a § 43(a) claim will not lie.[13] Sec-

___

[12] The First Amendment affords less protection to commercial speech and none to *false* commercial speech. *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771-72 (1976). No party questions that the speech linking P&G to Satanism is false.

[13] In *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 n.6 (5th Cir. 1996), we held that the Lanham Act extends only to false or misleading speech that is encompassed within the Supreme Court's commercial speech doctrine:

The "commercial" requirement was inserted to ensure that § 43(a) does not infringe on free speech protected by the First Amendment. See 135 Cong. Rec. H1216-17 (daily ed. Apr. 13, 1989) (statement of Rep. Kastenmeier) ("[T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material . . . . The section is narrowly drafted to encompass only clearly false and misleading commercial speech."); 134 Cong.Rec. 31,851 (Oct. 19, 1988) (statement of Rep. Kastenmeier) (commenting that the reach of § 43(a) "specifically extends only to false and misleading speech that is encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court"). *See generally Gordon & Breach Science Publishers S.A., STBS v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1533-34 (1994) (dis-
(continued...)

ond, and alternatively, Amway argues that even if the speech is commercial, the actual-malice standard should apply, because the Satanism rumor is an issue of public concern, and P&G is a "limited-purpose public figure" with respect to the rumor.

Thus, to determine what P&G is required to prove to prevail on its § 43(a) claim that Amway misrepresented its associations and commercial activities, we first must determine whether the spreading of the false Satanism rumor is "commercial" speech. If we decide it is, we must decide whether the fact that the false speech was made about a "limited-purpose public figure" on an issue of public concern brings the actual-malice standard into play. This effectively would trump the traditional view that there is no First Amendment protection for false commercial speech. We review these questions of law *de novo*. *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997).

### A.

We begin by examining what is meant by, and what protections extend to, "commercial speech." First, we consider whether the commercial speech line of cases, which mainly deals with government regulation of speech, should apply in this case of a private action for false speech.[14] Second, we examine the historical development of the commercial speech exception to the full protections granted by the First Amendment. In making this examination, we pay particular attention to the characteris-

tics that the Supreme Court has said make certain speech "commercial" and therefore worthy of less protection. Third, we take the facts of the case *sub judice* and apply the test set out in *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), for determining whether a specific instance of speech is commercial. Our application of the *Bolger* test is what ultimately determines whether the speech is commercial.

### 1.

P&G relies heavily on *U.S. Healthcare, Inc. v. Blue Cross*, 898 F.2d 914 (3d Cir. 1990), to argue that the commercial speech line of cases developed in the context of government regulation also should apply here in the context of a private suit for false speech. In *U.S. Healthcare*, the two parties had waged an advertising battle contrasting the benefits of HMO health insurance plans with "traditional" and preferred provider organization ("PPO") plans. When U.S. Healthcare sued under the Lanham Act, Blue Cross argued that the commercial speech doctrine was inapplicable because the Supreme Court "views damage claims [brought by private citizens] and government restrictions of speech as requiring distinctly different analysis for First Amendment purposes." *Id.* at 927.

As we do now, the court treated the issue as one of first impression. It began by noting that under the First Amendment, the correctness of ideas is judged not by courts, but in the marketplace of ideas.[15] With regard to com

---

[13](...continued)
cussing the legislative history of the Lanham Act).

[14] This is a question of first impression in this circuit.

[15] The Third Circuit said:

Most speech is protected by the First Amendment. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503
(continued...)

mercial speech, however, the court "believe[d] the subordinate valuation of commercial speech is not confined to the government regulation line of cases[,]" but instead should extend to defamation and Lanham Act cases as well. *Id.* at 932. The court noted that the Supreme Court

> on many occasions has recognized that certain kinds of speech are less central to the interests of the First Amendment than others. . . . In the area of protected speech, the most prominent example of reduced protection for certain kinds of speech concerns commercial speech. Such speech, we have noted, occupies a "subordinate position in the scale of First Amendment values." *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 . . . (1978). It also is more easily verifiable and less likely to be deterred by proper regulation. *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771-772 . . . (1976). Accordingly, it may be regulated in ways that might be impermissible in the realm of noncommercial expression. *Ohralik*, . . . [436 U.S.] at 456 . . .; *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 562-63 . . . (1980).

*U.S. Healthcare*, 898 F.2d at 932 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 758 n.5 (1985)) (some ellipses and brackets added). Based on this language, the *U.S. Healthcare* court concluded that the lesser protection commercial speech receives from direct government regulation also must apply to private actions for defamation and the like.

We agree. If commercial speech receives less protection from government regulation, then it also should receive less protection from private suits, which are not much more likely than are government regulation to infringe on those values the First Amendment seeks to protect. Furthermore, private suits can be a form of government regulation.

2.

Having determined that the commercial speech line of cases should apply here, we examine it and the characteristics of commercial speech it reveals. We also review the instant facts to determine whether they meet the characteristics that the Supreme Court has said define commercial speech.

---

[15](...continued)
(1984) (there are "few classes of 'unprotected' speech"). "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz* [*v. Robert Welch, Inc.*], 418 U.S. [323,] 339-40 [(1974)] (footnote omitted), *quoted in Jenkins v. KYW*, 829 F.2d 403, 408 (3d Cir. 1987). Even false statements of fact are insulated from liability in some situations. *Hepps*, 475 U.S. [767,] 778 [(1986)]; *Gertz*, 418 U.S. at 340-41. As Judge Learned Hand put it, the First Amendment "'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943), *aff'd*, 326, U.S. 1 (1945)).

*U.S. Healthcare*, 898 F.2d at 928.

10

Commercial speech has been defined, at its core, as speech that merely proposes a commercial transaction. *Va. State Bd.*, 425 U.S. at 762. Because such speech traditionally has been thought less valuable than political speech, which is at the core of the First Amendment, commercial speech is not accorded the full protections given to political speech, speech on matters of public concern, and speech regarding public figures.[16] In fact, for a time it was thought that commercial speech might not be worthy of any First Amendment protection.[17]

In *Virginia State Board*, the Court finally decided that commercial speech should receive some protection, holding that a state may not prohibit pharmacists from truthfully advertising the prices at which they sell drugs. The Court suggested, however, that instead of the strict scrutiny with which courts review most restrictions on speech, a lower standard of scrutiny is appropriate for commercial speech. The Court noted that false or misleading commercial speech should receive no protection,[18] because commercial speech merely gives information to consumers about a producer's goods, and any false information either has no value or is harmful.

The Court since has held that speech is commercial when it is an "expression related solely to the economic interests of the speaker and its audience." *Central Hudson*, 447 U.S. at 561 (citing *Va. State Bd.*, 425 U.S. at 762 (other citations omitted)). Additionally, in defining something as commercial speech, the Court says we are to rely on "the 'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56 (1978).

Further, although Amway argues that the Satanism rumor is a matter of public concern, which should make the speech noncommercial, the Court "ha[s] made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger*, 463 U.S. at 68 (quoting *Central Hudson*, 447 U.S. at 563, n.5). Thus, in *Bolger* the Court held that informational pamphlets mailed by a condom manufacturer

---

[16] In *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 564 n.6 (1980), the Court explained why commercial speech may be more heavily regulated:

Two features of commercial speech permit regulation of its content. First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity. In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation.

[17] *See Valentine v. Christensen*, 316 U.S. 52 (1942); *Breard v. Alexandria*, 341 U.S. 622 (1951); *Murdock v. Pennsylvania*, 319 U.S. 105, 111 (1943); *Jamison v. Texas*, 318 U.S. 413, 417 (1943).

[18] *Va. State Bd.*, 425 U.S. at 771-72 n.24 ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it . . . .").

directly to the public constituted commercial speech, even though the pamphlets spoke about matters of public concern.[19]

A recent examination of Supreme Court precedent explaining why commercial speech receives less protection was made in *U.S. Healthcare*, in which the court identified four characteristics of commercial speech that have been set out by the Supreme Court over the years. First, commercial speech makes a qualitatively different contribution to the exposition of ideas.[20] Second, commercial speech is more durable than other speech because the speaker has an economic motivation and is less likely to be chilled in its speech.[21] Third, "commercial speakers have extensive knowledge of both their market and their own products. Consequently, they are uniquely situated to evaluate the truthfulness of their speech."[22] Fourth, "[t]o require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech."[23]

If we examine the facts of this case in light of these four characteristics, we see that the speech at issue here has some but not all of the characteristics typically found in commercial speech. The first characteristicSSthat commercial speech makes a qualitatively different contribution to the exposition of ideasSSdoes not shed much light on whether the speech in this case is commercial.

---

[19] Youngs Drug Products Company sent out two informational pamphlets. The first was called "Condoms and Human Sexuality," which specifically referred to the advantages of a certain brand of condoms. The second informational pamphlet was called "Plain Talk about Venereal Disease." It discussed venereal disease and condoms without ever referencing any specific condoms. The only reference to Youngs Drug's products was at the bottom of the last page, where Youngs Drug identified itself as the manufacturer of the Trojan-brand condoms. The Court noted that Youngs Drug described itself as "the leader in the manufacture and sale of contraceptives." The Court opined that simply because "a product is referred to generically does not, however, remove it from the realm of commercial speech. For example, a company with sufficient control of the market for a product may be able to promote the product without reference to its own brand names." *Bolger*, 463 U.S. at 67 n.13. Even though the Court concluded that the speech in *Bolger* was commercial, it nevertheless held that the federal statute was an unconstitutional restriction on the distribution of truthful information. *Id.* at 74.

[20] *U.S. Healthcare*, 898 F.2d at 933-34 (citing *Central Hudson*, 447 U.S. at 561 (defining commercial speech as "expression related solely to the economic interests of the speaker and its audi-

[20](...continued)
ence")).

[21] *Id*. at 934 (quoting *Va. State Bd.*, 425 U.S. at 772 n.24 (explaining that this quality "may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker.")); *see also Dun & Bradstreet*, 472 U.S. at 748 n.5, 762 & n.8 (discussing durability "to show how many of the same concerns that argue in favor of reduced constitutional protection" in commercial speech actions also apply to defamation actions concerning private speech).

[22] *Id.* (citing *Central Hudson*, 447 U.S. at 564 n. 6; *Bates v. State Bar*, 433 U.S. 350, 381 (1977); *Va. State Bd.*, 425 U.S. at 772 n.24; *Dun & Bradstreet*, 472 U.S. at 758 n.5, 762 & n.8).

[23] *Id.* (quoting *Ohralik*, 436 U.S. at 456).

It might be that spreading the Satanism rumor does not contribute to the exposition of ideas. Despite the falsity of the rumor, however, it touched on the type of issues that are at the heart of First Amendment protections, namely: religious issues and issues of how corporations act and influence society. Further, it is uncertain whether the speech was related solely to the economic interests of the speaker or whether, instead, Haugen and other distributors were sincerely, albeit mistakenly, discussing the rumor.

The second characteristic—that the speaker's economic motivation makes the speech more durable—favors classifying Amway's speech as commercial. If the Satanism rumor were true, it is doubtful that the requirement to verify it before repeating it would stop distributors from spreading the rumor about one of their competitors. We have some reservation about stating this too strongly, however, for we can imagine cases in which employees of one company might legitimately but mistakenly repeat and discuss news about the political, religious, or other beliefs of employees of a competitor. It would violate First Amendment principles to quell all speech on these issues among members of a competing company until the news was fully and exhaustively verified.[24]

The third characteristic—that competitors

have extensive knowledge of their market and products—applies imperfectly to these facts. Amway has extensive knowledge of its market and products and is in a good position to know the acts of its competitors. In this case, however, the rumor discusses P&G's use of its profits and its charitable giving—topics about which Amway is likely to know less because they do not relate directly to P&G's products or sales methods. Nevertheless, if Haugen had checked with Amway, he could have verified that the rumor was false, because Amway had been aware of its falsity since the 1980's.

The fourth characteristic—a parity of constitutional protection for commercial speech would invite dilution of the First Amendment—is, as the Third Circuit noted, an extrinsic reason that cannot be applied to the facts of any one case. We accordingly do not discuss it.

In *U.S. Healthcare*, 898 F.2d at 935, the court determined that the speech had all the characteristics of commercial speech. The court concluded that

> [b]ecause the thrust of all of the advertisements is to convince the consuming public to bring its business to one of these health care giants rather than the other, there is no doubt that the advertisements were motivated by economic self interest. . . . [W]e believe it would have to be a cold day before these corporations would be chilled from speaking about the comparative merits of their products.

*Id.* The court added that

> these are advertisements for products and services in markets in which U.S.

---

[24] A current example may help illustrate this point. It was recently reported that some movie studios have conducted advertising campaigns and focus groups on children under the age of seventeen to make some of their R-rated movies more attractive to them. Discussion of this issue may be of true concern to members of competing movie studios. Holding the accuracy of such discussion to a strict-liability standard likely would violate First Amendment values.

Healthcare and Blue Cross/Blue Shield deals—and, presumably, know more about than anyone else. The facts upon which the advertisements are based—comparative price, procedures, and services offered—are readily objectifiable. These advertisements were precisely calculated, developed over time and published only when the corporate speakers were ready. Consequently, the advertisements were unusually verifiable.

*Id.*

Unlike the situation in *U.S. Healthcare*, the testimony here is that at least some of the speech at issue was made impulsively, without time to verify the facts. The *U.S. Healthcare* court stated that "[i]t is important to note that we do not have a situation in which a corporation addresses an issue of public concern involving a competitor, but does so with speech that is neither commercial nor chill resistant." *Id.* In the instant case, the primary question is whether Amway's distributors addressed an issue of public concern involving a competitor with speech that was neither commercial nor chill-resistant.

Our analysis of the general characteristics of commercial speech and the reasons behind its less protected status demonstrates that the speech here does not sort cleanly into either category: commercial or noncommercial. Although Supreme Court precedent and the Third Circuit's thoughtful analysis of what is commercial speech are helpful, we still are left with a difficult issue.

3.

We now apply the test the Court has set out to determine whether a specific instance of speech is commercial. In *Bolger*, the Court recognized three factors that help determine whether speech is commercial: (i) whether the communication is an advertisement, (ii) whether the communication refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech. If all three factors are present, there is "strong support" for the conclusion that the speech is commercial. *Bolger*, 463 U.S. at 67.

Here we consider the *Bolger* factors in reverse order[25] and conclude that the third—the motivation of the speaker—is determinative. This factor has not yet been decided by the trier of fact, so we remand for that to be done.

The second factor is easily satisfied—the message did refer to specific products of P&G's. The first factor—whether the speech is an advertisement—seems to collapse into the third factor in this case. Certainly the repetition of the rumor via AmVox was not an advertisement in the classic sense, but whether it could be considered as a negative advertisement against P&G seems to depend on the determination of the third factor—whether the speaker had an economic motivation for the speech. If Haugen or others who repeated this

---

[25] The *Bolger* test easily disposes of any question as to whether the fliers that were printed by Amway distributors and given to customers or potential customers were commercial speech—they plainly were. These fliers, associating P&G with Satanism and suggesting Amway products as alternatives to P&G products, (i) were advertisements—i.e., they proposed a commercial transaction, (ii) they referred to specific products, and (iii) the distributors plainly had an economic motive in distributing them.

rumor did have economic motivations, then the message resembles an advertisement seeking to encourage downline distributors to eschew P&G and buy Amway. If the motivation was not economic, then this looks more like a case of individuals' repeating false speech on a matter of public concern.

This question of the speaker's motivation will also help to clear up the difficulty in determining whether the characteristics of commercial speech summarized in *U.S. Healthcare* were present here. If the speakers were economically motivated, then issues of the quality of the speech, its durability, and the knowledge the speakers had of the relevant market and products become both more relevant and easier to determine.

Thus, on remand, if the trier of fact finds that the motivation behind the Amway distributors' repetition of the rumor to other distributors was not economic, the speech is not commercial, and there can be no Lanham Act claim. On the other hand, if an economic motivation is found, the speech is commercial, and a violation of the Lanham Act may be found.[26]

---

[26] We are not simply repackaging the "actual malice" requirement as a requirement of economic motivation. A finding of actual malice turns on the finding of false speech knowingly made, or of false speech made with a reckless disregard for the truth. The requirement of finding an economic motivation to label something commercial speech does not require a finding that the speech was false or that the speaker knew the speech was false before making it, but only a motive to profit by the speech. Once that motive is found, and if the other *Bolger* elements are present to provide strong support that the speech is commercial, the speech is dropped to the less-protected status of commer-
(continued...)

The question whether an economic motive existed is more than a question whether there was an economic incentive for the speaker to make the speech;[27] the *Bolger* test also requires that the speaker acted *substantially* out of economic motivation. Thus, for example, speech that is principally based on religious or political convictions, but which may also benefit the speaker economically, would fall short of the requirement that the speech was economically motivated.[28] We stress that we are

---

[26](...continued)
cial speech, and a suit may be successful against the speaker regardless of his knowledge of falsity.

[27] Professor Farber has pointed out that the mere existence of some economic motivation cannot be enough to drop speech to the lower protected status of commercial speech: "Economic motivation could not be made a disqualifying factor [from maximum protection] without enormous damage to the first amendment. Little purpose would be served by a first amendment which failed to protect newspapers, paid public speakers, political candidates with partially economic motives and professional authors." Farber, *Commercial Speech and First Amendment Theory*, 74 NW. U. L. REV. 372, 382-383 (1979) (footnotes omitted).

[28] We offer a specific example: A woman who owns a small religious book and music store tells customers that most rock and roll music is influenced by the devil and that the only kind of rock music they should buy is "Christian rock," which is, of course, the only kind she sells. The determination of whether a Lanham Act suit could be brought will turn on her motivation.

Evidence that she started the bookstore because of strongly-held religious beliefs that Christian books and music need to be made available to combat the evils of rock and roll and pulp fiction would be compelling evidence of a primarily reli-
(continued...)

not shortening the *Bolger* test to a single factorSSwhether the speaker's motive was economicSSbut rather, we conclude that the other two *Bolger* factors are not conclusive, and therefore the motive factor is determinative.

This does not mean that whenever the primary motivation for speech is economic, the speech is commercial.[29] As the Court said in *Bolger*, finding all three factors merely provides "strong support" for the proposition that the speech is commercial. The difference between commercial speech and noncommercial speech is, after all, "a matter of degree." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993). We can well imagine cases in which a speaker's primary motivation is economic, but the speech nonetheless is protected.[30]

Also, in determining whether there was an economic motivation to the repetition of the rumor, the finder of fact is free to take into account, among other things, Amway's unique structure. Pertinent is the fact that Amway distributors make money not simply by selling Amway products to the public, but also by recruiting other distributors into the organization, who become "downline" distributors, and upon whose sales the "upline" distributors then get commissions.

This system gives the distributors a motivation not just to sell Amway products, but also to recruit distributors and to encourage their sales. Thus, when Haugen and other Amway distributors spread the Satanism rumor via AmVox to their downline distributors, they were not simply repeating a rumor to co-workers or fellow independent distributors; they were repeating a rumor to persons analogous to employees,[31] in whose motivation and sales they have a direct interest. These facts, and all other relevant evidence, of course, may be used by the finder of fact in determining whether, as a matter of fact, those who circulated the Satanism rumor via AmVox acted out of economic motivation.

B.

Notwithstanding Supreme Court precedent holding that false commercial speech receives no First Amendment protection, Amway argues that we should require a finding of actual malice whenever speech is made about a public figure on an issue of public concern. In making this argument, Amway looks to the line of defamation cases setting out and developing the actual-malice standard.

That standard was developed in *New York Times v. Sullivan*, 376 U.S. 254 (1964).

---

[28](...continued)
gious, rather than economic, motivation for her speech. On the other hand, evidence showing that she is agnostic and opened the bookstore only after a case study in her MBA program showed that Christian bookstores can be extremely profitable when set up in the right locations would be strong evidence that her speech was economically motivated and thus commercial.

[29] As the Court said in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974), "it is often true that not all of the considerations which justify adoption of a given rule will obtain in each particular case decided under its authority."

[30] Labor cases come to mind as an example.

[31] We use the phrase "analogous to employees" purposely. We are merely making an analogy and are not ruling on whether Amway distributors are employees or independent contractors. We have not been asked to decide this question, nor do we have sufficient evidence to do so.

There, a group of black clergymen ran an advertisement in the *Times* in the form of an editorial; they spoke of the civil rights demonstrations by black students then occurring in the South and of the intimidation and violence practiced against the protestors and against Dr. Martin Luther King, Jr. The advertisement complained of the police responses to the demonstrators and asked for financial donations in support of the student movement, the struggle for the right to vote, and the legal defense of Dr. King. L.B. Sullivan, the Montgomery commissioner in charge of police, sued the clergymen and the *Times* for civil libel, arguing that the actions ascribed to the "police" were necessarily imputed to his leadership and that some of the accusations were false. Sullivan further argued that the Times could have discovered that the allegations were false by checking its files of previously published articles.

The Court agreed that references to the police could be imputed to Sullivan and that some of them were false. Nevertheless, the Court held that proof of more than factual inaccuracies was required to prevent speech protected by the First Amendment from being "chilled." The Court held:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'SSthat is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*Id.* at 279-80.[32]

Three years later, the Court extended the protection of the actual malice standard from public officials to public figures in the companion cases of *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker*, 388 U.S. 130 (1967). In *Gertz v. Welch*, 418 U.S. 323, 342 (1974), the Court explained why the actual-malice standard is appropriate in defamation cases involving public officials or public figures as plaintiffs. The Court gave the reasons for the lower level of protection for these plaintiffs:

> Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity

[32] *See also New York Times*, 376 U.S. 271-72 (stating that "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'") (quoting *N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1963)). The inevitability of erroneous statements being made in free debate is not a new concept:

> [T]o argue sophistically, to suppress facts or arguments, to misstate the elements of the case, or misrepresent the opposite opinion . . . all this, even to the most aggravated degree, is so continually done in perfect good faith, by persons who are not considered, and in many other respects may not deserve to be considered, ignorant or incompetent, that it is rarely possible, on adequate grounds, conscientiously to stamp the misrepresentation as morally culpable; and still less could law presume to interfere with this kind of controversial misconduct.

J. Mill, ON LIBERTY, 47 (Oxford: Blackwell 1947).

to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

*Id.* at 344 (footnote omitted).

A plaintiff becomes a general purpose public figure by attaining pervasive power and influence in society. *Id.* at 345. Alternatively, he may become a limited-purpose public figure with regard to that controversy by thrusting himself into a particular public controversy "to influence the resolution of the issues involved." *Id.* "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." *Id.*

We are powerless to decide whether this is one of those "exceedingly rare" cases in which plaintiff P&G involuntarily has become a public figure, because that issue has not been properly raised on appeal. In its opening brief, P&G noted that the district court found it to be a "limited-purpose public figure" for the purpose of analyzing whether it must prove actual malice in its § 43(a) claim; that court decided that the rumor is an issue of public concern and has been associated with P&G long enough to render P&G a limited-purpose public figure for purposes of discussion of the rumor. P&G did not assign error to this ruling in its initial brief but, instead, asserted that the repetition of the Satanism rumor constituted commercial speech to which the *New York Times* actual malice standard does not apply.

Amway correctly notes that because P&G

did not dispute this ruling, it is now bound thereby for purposes of this appeal. Although in its reply brief, P&G states that it "does not concede that it is a 'public figure' for purposes of defendants' misrepresentations," an "appellant abandons all issues not raised and argued in its initial brief on appeal." *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (declining to address argument discussed only in appellant's reply brief). Thus, we assume for purposes of this appeal, without deciding the issue as a matter of law, that P&G is a limited-purpose public figure with regard to the Satanism rumor.

Amway makes two arguments in support of its theory that P&G must prove actual malice. First, Amway turns to the well-reasoned opinion in *National Life Insurance Co. v. Phillips Publishing, Inc.*, 793 F. Supp. 627, 647 (D. Md. 1992), in which the court noted that there is a tension in the law regarding the treatment of false speech: "While defamation tolerates some false statements, in order to give the First Amendment the 'breathing space' it requires; commercial speech does not forgive false speech so easily." *Id.* The court opined that this tension should be considered rather than ignored when dealing with cases of false commercial speech about public figures.[33]

The *National Life* court reasoned that denying constitutional protection to all false

---

[33] The court cites two examples of the tension in Supreme Court caselaw. It compares *Gertz*, 418 U.S. at 340 (holding that application of the malice standard to public figure plaintiffs is predicated on the recognition that error is "inevitable in free debate"), with *Central Hudson*, 447 U.S. at 564 (stating that "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform. . . .").

commercial speech ignores the rationale of *Gertz*: that the need to protect one from false or misleading speech varies, depending on whether he is a private or public figure. The court pointed out that "[e]ven *U.S. Healthcare* recognized that a state has only a 'limited' interest in compensating public persons for injury to reputation by defamatory statements, but has a 'strong and legitimate interest' in compensating private persons for the same injury." *National Life*, 793 F. Supp. at 648 (quoting *U.S. Healthcare*, 898 F.2d at 930).[34] Thus, the court concluded that a state's interests in regulating false commercial speech and in providing some protection to public figures' reputations must be balanced against the free speech interest individuals have in being able to comment freely on public issues and public figures. The court held that the way to achieve this balance, in cases of commercial speech about a public figure, is to require that the plaintiff prove actual malice.

Amway's second argument is that the use of the actual-malice standard in commercial speech cases involving public figures avoids unrealistically treating commercial and non-commercial speech as though they do not overlap. Amway contends that such treatment ignores that political speech can arise from commercial motives or may address areas of great public concern.[35]

Although Amway raises legitimate points about the overlap between commercial and noncommercial speech, between economic and non-economic motivation for speech, and about the variable interest a state has in protecting a plaintiff's reputation depending on the plaintiff's status as a public or private figure, Supreme Court precedent prevents us from importing the actual-malice standard into cases involving false commercial speech.

To begin with, the Court has rejected attempts to blur the line between commercial speech and other types of expression. In *Central Hudson*, the majority rejected the rationale set forth in a concurrence that "[a]pparently . . . would accord full First Amendment protection to all promotional advertising that includes claims 'relating to . . . questions frequently discussed and debated by our political leaders.'" *Id.* at 563 n.5 (quoting *id.* at 581 (Stevens, J., concurring). In rejecting this approach, the majority reasoned that "we think it would blur further the line the Court has sought to draw in commercial speech cases." *Id.*[36]

---

[34] In *U.S. Healthcare*, the court addressed the same argument that Amway makes hereSSthat the actual malice standard should apply to protect even false commercial speech if it is made about a limited-purpose public figure. The court did not consider the argument directly, because it concluded that the corporations that were the parties in that case were not public figures. Nevertheless, it stated that "the [commercial] speech at issue does not receive heightened protection under the First Amendment. Because this speech is chill-resistant, the *New York Times* standard is not . . . 'necessary to give adequate "breathing space" to the freedoms protected by the First Amendment.'" *U.S. Healthcare*, 898 F.2d at 939 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)).

[35] *Cf. Bolger* (holding that First Amendment protects contraceptive manufacturer's unsolicited mailing of informational and advertising pamphlets to households, because contraception informationSSeven if distributed for commercial purposeSSis a matter of public concern).

[36] The Court noted that corporations

enjoy the full panoply of First Amendment
(continued...)

Further, the Court has consistently said that speech protected in one context is not protected when the purpose of the speech is commercial. In *Bolger*, the Court held that "advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." 463 U.S. at 68 (quoting *Central Hudson*, 447 U.S. at 563 n.5). "Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." *Id.*

Somewhat more recently, in *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626 (1985), the Court affirmed its *Central Hudson* and *Bolger* holdings. Zauderer was a lawyer who had been sanctioned by the disciplinary committee of his state supreme court for using deceptive newspaper advertisements. He claimed that his

speech was protected because some of the advertisements contained statements regarding the legal rights of persons injured by a contraceptive device. The Court held that these statements "in another context, would be fully protected speech," but "[t]hat this is so does not alter the status of the advertisements as commercial speech." *Id.* at 637 n.7.

*Central Hudson*, *Bolger*, and *Zauderer*, combined with the Court's plain statements that false commercial speech receives no protection,[37] foreclose us from importing the actual-malice standard from defamation into the law of false commercial speech. Thus, if the trier of fact determines that the Amway distributors' motives in spreading the Satanism rumor were economic and that the speech therefore was commercial, this false commercial speech cannot qualify for the heightened protection of the First Amendment, so P&G is not required to show actual malice in proving its Lanham Act claim.

The Tenth Circuit concluded similarly in this case, holding that the AmVox message was economically motivated and rejecting Amway's argument that such commercial speech should receive higher protection because it regarded a matter of public concern. *P&G v. Haugen*, 222 F.3d at 1275.

> In the present case, we are likewise dealing with a message containing both a noncommercial, "theological" component and a commercial component. As *Bolger* and *Fox* indicate, however, the

---

[36](...continued)

> protections for their direct comments on public issues. There is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions. In that context, for example, the State retains the power to "insur[e] that the stream of commercial information flow[s] cleanly as well as freely." . . . As we stated in *Ohralik*, the failure to distinguish between commercial and noncommercial speech "could invite dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech."

*Id.* (quoting *Va. State Bd.*, 425 U.S. at 772, and *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)).

---

[37] *E.g.*, *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 142 (1994); *Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 472 (1988); *Friedman v. Rogers*, 440 U.S. 1, 14-15 (1979); *Va. State Bd.*, 425 U.S. at 771-72 & n.24.

bare fact that the subject message contains a "theological" component is insufficient to transform it into noncommercial speech. If appellees had argued that a significant theological, political, or other noncommercial purpose underlay the subject message, the message might be accorded the substantially greater First Amendment protections enjoyed by "core" religious speech and the other varieties of noncommercial First Amendment speech such as political speech. *See, e.g., Pleasant v. Lovell*, 876 F.2d 787, 795 (10th Cir. 1989) (holding "that the presence of some commercial activity does not change the standard of first amendment review" where the organization engaged in such activity had a clear political purpose (citing *In re Grand Jury Proceeding*, 842 F.2d 1229, 1235 (11th Cir. 1988))). Significantly, appellees in the instant case have made no such claim. At no time have they argued there is any theological purpose underlying the subject message or its dissemination via their AmVox system.

*Id.*

Amway has argued here, as it apparently did not in the Tenth Circuit, that there was a theological concern underlying the speech. We thus are foreclosed from merely calling the speech commercial. Regardless, both the Tenth Circuit and this court are using the same test to determine commercial speech, and both reject Amway's argument that the actual-malice standard should apply.

We recognize that alternative methods of reconciling the law of commercial speech with that of defamation have been suggested. Professor Langvardt has suggested one tempting alternative. He posits that courts should adopt a negligence standard for private actions for false commercial speech.[38] After thoughtfully considering this solution, we feel compelled to reject it. While Professor Langvardt's proposal is compelling in a number of respects, our approach more closely adheres to the case-law and principles set out by the Supreme Court in the areas of commercial speech and First Amendment law.

Langvardt agrees with our analysis that the full protection from chill that the actual malice standard gives to core First Amendment speech is inappropriate in the context of less-protected commercial speech. He argues that, instead, a standard should be used that gives commercial speech an intermediate level of protection from chill. In his view, "negligence effectively provides an intermediate standard that falls between the polar extremes of actual malice and strict liability." Langvardt, 78 MINN. L. REV. at 393. Under such a regime, plaintiffs would be required to prove "that the defendant failed to use the degree of care a reasonable person would have exercised, under the circumstances, to ascertain the truth or falsity of the statement before making it." *Id.* at 393. To Langvardt, the use of a negligence standard recognizes that commercial speech is more durable than noncommercial speech, but it still prevents the former from being overly chilled by the possibility of private suits for

---

[38] Arlen W. Langvardt, *Commercial Falsehood and the First Amendment: A Proposed Framework*, 78 MINN. L. REV. 309 (1993).

strict liability under the Lanham Act.[39]

Langvardt would avoid Supreme Court precedent stating that false commercial speech receives no protection under the First Amendment by restricting this holding to the direct-government-regulation line of cases from which it sprang. He points out that the Court has not heldSSand he believes would not holdSSthat false commercial speech receives no First Amendment protection from private suits.[40] According to Langvardt, the reason the Court would not do so is that private suits have a greater potential to chill commercial speech than do direct government regulations. He claims that private suits are not as narrowly tailored and allow large damage awards, both of which create greater potential for chill.

Although support for this theory may be found in *New York Times*, 376 U.S. at 279-80, in which the Court said that "[t]he fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute," the Court has never limited its holding that false commercial speech receives no First Amendment protection. It is doubtful that the prospect of a private action is a significantly greater deterrent to a commercial speaker than is the prospect of the civil and criminal penalties available to government regulators. Further, a commercial speaker may be chilled in his speech by the prospect of having to pay the costs of a suit to have an overly broad regulation narrowed by a court.

Additionally, Langvardt's proposal, if adopted, would result in differing amounts of protection for false commercial speech depending on whether the speaker discusses his own goods or those of another. Langvardt acknowledges that false advertising claims by a defendant about its own products traditionally have been subjected to strict liability under § 43(a), and he does not argue that this excessively chills commercial speech. He maintains that strict liability should continue to apply to a defendant's claims about its own products but that a negligence standard should be applied to false statements about a competitor's products.

It seems, however, that this double standard would further confuse commercial speech law. The argument is not strong enough to justify differing standards of liability,[41] especially in light of the admonition that we not "blur further the line the Court has sought to draw in commercial speech cases." *Central Hud-*

---

[39] Langvardt's theory also would vary the standard by which a party must prove negligence, based on whether the speech is a matter of public or private concern. Allegations regarding the former should be proven by clear and convincing evidence, and the latter should be proven by a mere preponderance of the evidence. *Id.* at 393-95.

[40] Langvardt points out that before its 1989 revision, no suit could be brought under the Lanham Act for false advertising about a competitor. The Act was amended effective November 16, 1989, by the Trademark Law Revision Act of 1988, 15 U.S.C. §§ 1051-1128 (1988). The pre-1989 Act allowed only suits against companies for a company's false advertising about its own products. The post-1989 Lanham ActSSwith its strict liability standard for false commercial speechSSthus has a substantially greater potential to chill truthful commercial speech, according to Langvardt.

[41] Moreover, such a double standard could be subverted. Instead of saying that its product is the best, a company could state that all other products are inferior and by doing so move from a strict liability regime to one of negligence.

*son*, 447 U.S. at 563 n.5.

## V.

The district court was correct in dismissing P&G's alter ego, single business enterprise, and vicarious liability arguments against Ja-Ri and ADAC, because P&G provided neither sufficient evidence nor sufficient argument to support its position. P&G assigns error to these dismissals based on three grounds. First, it argues that it was unfairly surprised when the court applied Michigan rather than Texas law to these claims. Second, it contends that the court overlooked sufficient evidence to hold Ja-Ri and ADAC liable under the single-business-enterprise theory and vicariously liable for Lanham Act violations of downline distributors. Third, it avers that the court erred in *sua sponte* entering j.m.l. in favor of Ja-Ri, which P&G claims is a reversible violation of FED. R. CIV. P. 50(a)(2). We review a j.m.l. *de novo*. *King v. Ames*, 179 F.3d 370, 373 (5th Cir. 1999).[42]

None of P&G's arguments is adequately supported in its brief. First, P&G could not have been unfairly surprised that Michigan law might be applied to ADAC's motion for j.m.l. ADAC moved for j.m.l. based on Michigan law on May 7, 1999SSsix days before P&G rested its caseSSand, on May 10, P&G filed a memorandum in opposition to ADAC's memorandum on choice of law.

Second, P&G does not describe how it was prejudiced by the application of Michigan law. It does not provide examples of how the elements of Michigan and Texas law differ. Both

Texas and Michigan law require that to prevail on an alter ego theory or otherwise to pierce the corporate veil, one must prove that failing to do so would promote injustice. *See Mancorp, Inc. v. Culpepper*, 836 S.W.2d 844, 846 (Tex. App.SSHouston 1992, no writ); *Wells v. Firestone*, 364 N.W.2d 650 (Mich. 1984); *Foodland Distributors v. Al-Naimi*, 559 N.W.2d 379 (Mich. App. 1996). P&G does not even claim to have offered such proof. Thus, its argument that the court overlooked evidence sufficient to find against Ja-Ri and ADAC fails.

Third, rule 50 neither prohibits a court from suggesting that a party move for j.m.l. nor forbids a court from granting j.m.l. *sua sponte*. The rule merely states that if there is no sufficient evidentiary basis for the issue to go to the jury, "the court *may* determine the issue against that party and *may* grant a motion for [j.m.l.] against that party . . ." (emphasis added).

Finally, P&G advances not a single theory as to why Ja-Ri and ADAC should be held liable under alter ego, single business enterprise, or vicarious liability law. Instead, P&G merely asserts that they should be. "A party who inadequately briefs an issue is considered to have abandoned the claim." *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (citation omitted).

## VI.
### A.

The district court is correct that P&G does not have standing to bring a § 43(a) claim based on Amway's alleged misrepresentations to its distributors about its allegedly illegal pyramid scheme. P&G asserted its claim based on Amway's alleged misrepresentations to its distributors of the financial rewards of

---

[42] *See Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc).

being an Amway distributor. The court granted summary judgment based on its conclusion that P&G lacks prudential standing to bring this claim.

We review summary judgment rulings *de novo*. *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir. 1999). Summary judgment is proper when, taking the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Standing has constitutional and prudential components. *Bennett v. Spear*, 520 U.S. 154 (1997). To meet the constitutional standing requirement, a plaintiff must show (1) an injury in fact (2) that is fairly traceable to the actions of the defendant and (3) that likely will be redressed by a favorable decision. *Bennett*, 520 U.S. at 162; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Prudential standing requirements exist in addition to "the immutable requirements of Article III," *ACORN v. Fowler*, 178 F.3d 350, 362 (5th Cir. 1999), as an integral part of "judicial self-government," *Lujan*, 504 U.S. at 560. The goal of this self-governance is to determine whether the plaintiff "is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 n.8 (1986).[43]

These judicially created limits concern whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

*ACORN*, 178 F.3d at 363.

Although Congress cannot change constitutional standing requirements, it "can modify or even abrogate prudential standing requirements, thus extending standing to the full extent permitted by Article III." *Id.* (citing *Bennett*, 520 U.S. at 162) (other citation omitted). We therefore look to the statute in question to determine whether Congress expressed an intent to negate the background of prudential standing doctrine.[44]

### B.

The question whether, in § 43, Congress intended to abrogate the background of prudential standing doctrine is one of first impression in this circuit. Congress did not expressly negate the background of prudential standing in § 43(a), which states:

---

[43](...continued)
individual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim") (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99-100 (1979)).

[44] *See Bennett*, 520 U.S. at 163 ("Congress legislates against the background of our prudential standing doctrine, which applies unless it is expressly negated.").

[43] *See also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) (opining that federal courts adopt prudential limits on standing "to avoid deciding questions of broad social import where no (continued...)

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, whichSS

(A) is likely to cause confusion, or to cause mistake or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by *any person* who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (1994) (emphasis added). The words "any person" might lead one to conclude that Congress intended to abrogate the background of prudential standing for purposes of the Lanham Act and allow anyone to sue who could achieve Article III standing. Section 45, however, states in pertinent part:

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks, and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127 (1994).[45] We agree with *Conte Bros. Automobile, Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 229 (3d Cir. 1998):

This section makes clear that the focus of the statute is on anti-competitive conduct in a commercial context. Conferring standing to the full extent implied by the text of § 43(a) would give standing to parties, such as consumers, having no competitive or commercial interests affected by the conduct at issue. . . . The congressionally-stated purpose of the Lanham Act, far from indicating an express intent to abrogate prudential standing doctrine, evidences an intent to limit standing to a narrow class of potential plaintiffs possessing interests the protection of which furthers the purposes of the Lanham Act.

The court also pointed out that the Lanham Act was passed to codify statutory and common law of unfair competition that had developed before *Erie R.R. v. Tompkins*, 304 U.S.

---

[45] This language has been part of the Lanham Act since it was enacted in 1946. *See* PUB. L. NO. 489, reprinted in 1946 U.S.C.C.A.N. 412, 429.

64 (1938).[46] The court analyzed the earlier unfair competition laws and noted that "these earlier acts were drafted against the backdrop of common law doctrine similar to today's prudential standing doctrine that limited the eligible plaintiff class. *Conte Bros.*, 165 F.3d at 230 (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982)). This led the court to conclude that "[t]here is no indication that Congress intended in any of the Lanham Act's statutory precursors, or in the Lanham Act itself for that matter, to abrogate the common law limitations on standing to sue."[47] Having found that § 45 of the Lanham Act plainly sets out Congress's intent to maintain prudential standing requirements, we see no need to examine the legislative history or common law background of the Act, as the Third Circuit did. We nonetheless join that court in deciding that Congress did not intend to abrogate prudential standing limitations when it enacted the Lanham Act.

---

[46] *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 861 n.2 (1982) (White, J., concurring) (opining that the "purpose of the Lanham Act was to codify and unify the common law of unfair competition and trademark protection"); *see also Bonita Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989) (stating that the "law of unfair competition has its roots in the common-law tort of deceit"); *see generally* 1 J.THOMAS MC-CARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 5:2 (4th ed. 1996) (discussing common-law origins of Lanham Act).

[47] *Conte Bros.*, 165 F.3d at 230 (citing by analogy *Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters, Inc.*, 459 U.S. 519, 531-34 (1983) (describing congressional intent to incorporate common-law principles constraining class of plaintiffs entitled to sue under Clayton Act).

## C.

Also of first impression in this court is what test we should adopt in determining whether a plaintiff has statutory or "prudential" standing under the Lanham Act.[48] After a survey of the caselaw of other circuits,[49] we adopt the test

---

[48] We have stated in *dictum* that consumers should be denied prudential standing under the Lanham Act. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 (5th Cir. 1996) (noting that "most courts that have addressed the issue agree that in light of the pro-competitive purpose language found in § 45, 'consumers fall outside the range of "reasonable interests" contemplated as protected by the false advertising prong of Section 43(a) of the Lanham Act.'" (quoting *Serbin v. Ziebart Int'l Corp.*, 11 F.3d 1163, 1177 (3d Cir.1993))).

[49] Much of our prudential standing jurisprudence in this circuit has focused on whether a particular injurious act is within the "zone of interests" of a particular administrative statute. *E.g.*, *Stockman v. Fed. Election Comm'n*, 138 F.3d 144 (5th Cir. 1998); *Asbestos Info. Ass'n/N. Am. v. Reich*, 117 F.3d 891 (5th Cir. 1997). This is not an administrative law case, however, so standing is not governed by administrative law's "zone of interests" test. *See Clarke*, 479 U.S. at 400 n.16 (observing that the "zone of interest" test has been applied primarily in claims brought under the Administrative Procedure Act and "is most usefully understood as a gloss on the meaning of § 702 [of that Act] . . . . While inquiries into reviewability or prudential standing in other contexts may bear some resemblance to a 'zone of interest' inquiry under the APA, it is not a test of universal application."); *Bennett*, 520 U.S. 154, 163 (1997) ("The breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the [APA] may not do so for other purposes.") (citations omitted); *see also* William A. Fletcher, (continued...)

26

recently set forth in *Conte Bros.*[50] That court adopted the test for prudential standing under the Clayton Act that the Supreme Court set forth in *Associated General Contractors*, 459 U.S. at 538-44,[51] in which the Court identified a number of factors to be considered in determining prudential standing: (1) the nature of the plaintiff's alleged injury: Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws"?; (2) the directness or indirectness of the asserted injury; (3) the proximity or remoteness of the party to the alleged injurious conduct; (4) the speculativeness of the damages claim; and (5) the risk of duplicative damages or complexity in apportioning damages.

The first factor directs us to decide whether the alleged injury is of a type Congress sought to redress in providing a private remedy for violations of the Lanham Act. We conclude that P&G's injury based on Amway's alleged illegal pyramid scheme is not that type of injury. As stated in *Conte Brothers*:

> [T]he focus of the Lanham Act is on "commercial interests [that] have been harmed by a competitor's false advertising," *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316 (3d Cir. 1995), and in "secur[ing] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not." S. Rep. No. 1333, 79th Cong., 2d Sess. (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1275.

*Conte Bros.*, 165 F.3d at 234.

The Lanham Act was enacted to provide protection against the unfair and misleading use of another's trademark.[52] Given this, it seems unlikely that the injury alleged hereSSfraudulent misrepresentations made to potential employees to convince them to work for and buy from Amway, resulting ultimately in lower sales of some of P&G's productsSSis of a type that Congress sought to redress in providing the Lanham Act. P&G has alleged attenuated harm arising from the alleged fraud-

---

[49](...continued) *The Structure of Standing*, 98 YALE L.J. 221, 255-63 (1988) (criticizing use of "zone of interest" test outside of administrative context).

[50] Both P&G and Amway used the test from *Conte Bros.* in analyzing whether P&G met prudential standing requirements in pursuing its § 43(a) claim based on Amway's allegedly illegal pyramid scheme.

[51] Although the Third Circuit is the first circuit to use this standing analysis in the context of the Lanham Act, it noted, 165 F.3d at 233, that two prominent commentaries have endorsed the adoption of the standard. *See* 4 MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:32 n.1 (4th ed. 1996) ("In the author's opinion, some limit on the § 43(a) standing of persons remote from the directly impacted party should be applied by analogy to antitrust law, such as use of the criteria listed in *Associated General Contractors* . . . ."); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 3, cmt. f (1995) ("In determining whether an asserted injury is sufficiently direct to justify the imposition of liability, the Supreme Court's analysis of similar issues under federal antitrust law may offer a useful analogy.").

[52] *See* S. REP. NO. 79-1333 (1946), reprinted in 1946 U.S.C.C.A.N. 1274, 1275 (stating that "there is no essential difference between trade-mark infringement and what is loosely called unfair competition").

ulent inducements but not alleged loss of good will or reputation as a result of Amway's alleged pyramid scheme.

The second factor—directness of the alleged injury—also suggests no standing. This is not the case of one competitor's directly injuring another by making false statements about his own goods and thus inducing customers to switch from a competitor. Rather, the injury is alleged to arise from a competitor's fraudulently inducing a workforce—not necessarily its competitor's—to work for it and sell its product by promises to the workers that they will be handsomely compensated.

There are no allegations that the workers otherwise would have worked for P&G. Instead, the attenuated claimed harm is alleged to come from the fact that an increase in sales of Amway products eventually will lead to lower sales for its competitor. If standing is allowed here, one could argue that any competitor's fraudulent act in running its business that gives it an advantage could be sued upon as a violation of the Lanham Act. Opening up standing to this extent would not be prudent.

The third factor—the proximity of the party to the alleged injurious conduct—also undercuts standing in this case. In *Associated General Contractors*, 459 U.S. at 542, the Court held that "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest . . . diminishes the justification for allowing a more remote party . . . to perform the offices of a private attorney general." The distributors who are more immediate to the injury than is P&G probably do not have standing to sue under the Lanham Act, which does not give consumers standing to sue. *See Seven-Up*, 86 F.3d at 1383. These distributors

could vindicate the public interest, however, by suing for fraud. Thus, there is no need to empower P&G as a private attorney general in this case.

The fourth factor—speculativeness of the damages—also weighs against standing. In fact, P&G did not even attempt to submit evidence on lost profits resulting from Amway's alleged pyramid scheme. In its reply brief, P&G argues that it is not bound to submit such evidence, but that damages instead should be determined based on P&G's relative market share. Given the hundreds of P&G products and potential competitors, as well as the difficulty of determining what percentage of Amway's distributors were fraudulently induced to work for Amway, it is hard to see how any damages awarded would not be highly speculative.

Finally, the fifth factor—the risk of duplicative damages or complexity of apportioning damages—informs us to deny standing. Not only could every competitor in the market sue Amway if P&G is allowed standing here, but there would be nothing to stop other companies not in direct competition with Amway from suing based on harm suffered by having potential workers fraudulently induced away.

This analysis shows that all five factors unanimously (though to various degrees) counsel against granting standing in this circumstance. Granting prudential standing "would result in a great increase in marginal litigation in the federal courts and would not serve the underlying purposes of the Lanham Act—to ferret out unfair competition methods and protect businesses from the unjust erosion of their good will and reputation." *Conte Bros.*, 165 F.3d at 236.

## VII.

The district court dismissed P&G's RICO claims under FED. R. CIV. P. 12(b)(6). P&G argues that Amway's repetition of the Satanism rumor and its alleged illegal pyramid scheme constitute violations of RICO, 18 U.S.C. § 1962(c) and (d). P&G listed mail fraud and wire fraud as the predicate acts for its RICO claims but does not claim to have relied on any of the misrepresentations that Amway allegedly made via mail and wire. Instead, P&G argues that it is not required to allege and prove reliance. We affirm in part and reverse and remand in part on this issue.

We review *de novo* the dismissal of a complaint for a failure to state a claim for which relief can be granted under rule 12(b)(6). *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). A claim may not be dismissed unless it appears beyond doubt that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief. *Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992). For purposes of our review, we must accept the plaintiff's factual allegations as true and view them in the light most favorable to the plaintiff. *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995).

In civil RICO claims in which fraud is alleged as a predicate act, reliance on the fraud must be shown: "[W]hen civil RICO damages are sought for injuries resulting from fraud, a general requirement of reliance by the plaintiff is a commonsense liability limitation." *Summit Props. Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556 (5th Cir. 2000), *petition for cert. filed*, 69 U.S.L.W. 3296 (Oct. 13, 2000) (No. 00-606).

P&G points out that in *Summit* we also set out a narrow exception to this rule. "In general, fraud addresses liability between persons with direct relationshipsSSassured by the requirement that a plaintiff has either been the target of fraud or has relied upon the fraudulent conduct of defendants." *Summit*, 214 F.3d at 561.

Thus, in *Summit* we ruled that a target of a fraud that did not itself rely on the fraud may pursue a RICO claim if the other elements of proximate causation are present.[53] We cited with approval *Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260, 263-64 (4th Cir. 1994), which "held open the possibility that a plaintiff company may not need to show reliance when a competitor lured the plaintiff's customers away by a fraud directed at the plaintiff's customers." *Summit*, 214 F.3d at 561.

Consequently, P&G's RICO claims based on Amway's alleged spreading of the Satanism rumor to lure customers from P&G are claims on which relief can be granted. P&G has alleged that using the wire and the mail, Amway attempted to lure P&G's customers away by fraud. Although P&G did not rely on the fraud, this falls into the narrow exception carved out by *Summit*, in which we said that "[i]n the current case, for example, the defendants' competitors might recover for injuries to competitive position . . . ." *Summit*, 214

---

[53] Although in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), the Court held that simple "but-for" causation is not enough to confer civil RICO standing, that conclusion "is no more than that common law ideas about proximate causation inform the understanding of RICO." *Israel Travel Advisory Serv., Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1257 (7th Cir. 1995).

F.3d at 561. Thus, if P&G's customers relied on the fraudulent rumor in making decisions to boycott P&G products, this reliance suffices to show proximate causation.

P&G's RICO claims for injury based on Amway's alleged illegal pyramid structure cannot meet the requirement that the alleged predicate acts proximately caused P&G's damages, however. Although some Amway distributors may have bought more P&G products "but-for" being lured into joining Amway, injury to P&G did not flow directly from such inducements. Further, there are too many intervening factors for proximate causation to be proven here. Allowing RICO claims for such tenuous causation would open floodgates similar to those that we are unwilling to open under the Lanham Act. *See Holmes*, 503 U.S. at 267, 272. "Life is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." *Holmes, id.* at 287 (Scalia, J., concurring).

We affirm the dismissal of P&G's RICO claims based on Amway's allegedly illegal pyramid scheme, and we reverse the dismissal of the RICO claims based on Amway's spreading of the Satanism rumor. The complaint, as pleaded, does state a claim upon which relief may be granted.

VIII.

The district court erred in dismissing P&G's claim for product disparagement under the Lanham Act and its claims under § 16.29 of the TEXAS BUSINESS AND COMMERCE CODE. During trial, P&G argued that Amway had disparaged P&G's Crest toothpaste by alleging that Crest scratches teeth. The district court initially found that "there is evidence in this case that was presented to the jury that the challenge advertisement was literally false. And, so, [the Crest claim] stays under the Lanham Act." Later, however, the court dismissed the remaining claims without addressing the disparagement claim. We review these dismissals *de novo. King v. Ames*, 179 F.3d 370, 373 (5th Cir. 1999).

This presents an interesting dilemma. The court first ruled that there was enough evidence to go to the jury on the product disparagement claim, but later dismissed the claim with the rest of the case, without explanation. We are left wondering whether the court inadvertently dismissed the disparagement claim along with the rest of the case or whether, instead, the court realized that there was not enough evidence to go to the jury. Because there is nothing in the record to resolve this puzzle, we reverse and remand the dismissal of the disparagement claim under the Lanham Act.

Amway argues in its brief that P&G has effectively waived this issue, "since P&G makes no effort in this court to show that it even had a case under either [the product disparagement or the §16.29] claim. . . " (*citing Frazier v. Garrison Indep. Sch. Dist.*, 980 F.2d 1514, 1528 (5th Cir. 1993) ("This court is entitled to a reasoned statement of why the district court erred. By the brief nature of their claim, the [appellants] wholly fail to demonstrate any error on the part of the district court.")).

It would have been more helpful if P&G had provided us with more information on the product disparagement claim. It is enough, however, that P&G points out that at one point the district court found that there was enough evidence of disparagement to get to a jurySSincluding evidence that Amway had

30

made a factually false claim that Crest scratches teethSSand then later dismissed the claim without explanation. This alone is sufficient to show reversible error.

As to the § 16.29 claim, the court dismissed it based on its finding that *res judicata* from the Utah case barred the claims against Haugen and Walker, and based on its ruling that P&G was required to prove actual malice to prevail on its Lanham Act claim. The court stated:

> [T]he only other issue that would have been left alive in the case would have been the Section 1629 case under the business of commerce code, which essentially allows for injunctive relief without any of the other claims in the case, the Court dismisses as a matter of law the Section 1629 of the TEXAS BUSINESS & COMMERCE CODE claim for injunctive relief.

Because we are reversing and remanding on *res judicata* and actual malice, the dismissal of which formed the basis for the dismissal of the § 16.29 claim, we also reverse and remand the § 16.29 claim.

### IX.

The district court did not err in ruling that P&G's fraud claim was barred by the statute of limitations. P&G alleged a claim of common law fraud against Amway arising from falsely assuring P&G that Amway would help fight the Satanism rumor. The court granted summary judgment to Amway on this issue, finding the claim time-barred. P&G assigns error to this ruling, which we review *de novo*. *Prytania Park Hotel*, 179 F.3d at 173.

In Texas, the statute of limitations for fraud claims is four years. In *Jackson v. Speer*, 974 F.2d 676, 679 (5th Cir. 1992), we explained:

> If, however, the injured party is not aware of the fraud or the fraud is concealed, the statute of limitations begins to run from the time the fraud is discovered or could have been discovered by the defrauded party's exercise of reasonable diligence. *Knowledge of facts that would lead a reasonably prudent person to make inquiry which would lead to a discovery of the fraud is knowledge of the fraud itself*.

(Emphasis added.)

P&G claims that, even exercising reasonable diligence, it could not have discovered the fraud until 1995. Evidence submitted by Amway that was uncontroverted by P&G shows, however, that P&G knew, or reasonably should have known, by the mid-to-late 1980's that it could not rely on Amway's statements that Amway would help stop the Satanism rumor. Gerald Gendall, head of public affairs at P&G, testified that he "thought P&G should have sued Amway almost on a continuous basis." Gendall also stated that after 1983, he did not rely on any representations that Amway was doing all it could to stop the rumor. Executive Vice-President Laco also testified that he believed P&G could have sued Amway for the acts of its distributors in the early to mid-1980's. Finally, John Smale, P&G's CEO from 1981 to 1986, testified:

> Q. When did you first come to the realization that you should have gone after Amway sooner?
>
> A: I don'tSSI suspect in theSSI don't

31

know, towards the late '80s as these rumors continued and as we got more and more lack of response from Amway.

Given this undisputed testimony, a reasonable jury could not have concluded that P&G did not know that it could not rely on Amway's representations that Amway would do all it could to combat the Satanism rumor. P&G's argument that Amway is estopped from arguing that this claim is time-barred because Amway concealed its fraudulent behavior was also correctly dismissed on summary judgment, for the same reason.

## X.

We summarize, as follows: The judgment is reversed as to the *res judicata* effect of the Utah judgment. Further, the judgments of the Utah court and the Tenth Circuit do not present any issues of collateral estoppel that bind the Texas court. P&G's Lanham Act claim for disparagement of its commercial activities is remanded for fact-finding to determine whether the primary motivation of the Amway disseminators of the Satanism rumor was economic. If it was, then the speech is commercial; if not, the speech was noncommercial, and no Lanham Act claim is available. The judgment that P&G must prove actual malice to succeed on its Lanham Act claim for disparagement of commercial activities is reversed; no actual malice need be found.

The judgment dismissing P&G's alter ego, single business enterprise, and vicarious liability arguments against Ja-Ri and ADAC is affirmed. The judgment that P&G did not have prudential standing to bring a Lanham Act claim based on Amway's alleged misrepresentations to its own distributors is affirmed. The judgment dismissing P&G's RICO claims based on spreading the Satanism rumor is reversed and remanded.

The judgment dismissing P&G's RICO claims based on Amway's alleged illegal pyramid structure is affirmed. The judgment dismissing P&G's Lanham Act product disparagement claim for the alleged disparagement of Crest toothpaste is reversed, as is the judgment dismissing P&G's TEXAS BUSINESS AND COMMERCE CODE § 16.29 claim. Finally, the judgment that P&G's fraud claim is time-barred is affirmed.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings in accordance with this opinion.